FILED
2014 Mar-24  PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **RACHEL HILLEY, individually and on behalf of other members of the general public similarly situated,** ) ) ) ) | |
| **Plaintiff,** ) ) | |
| **vs.** ) ) | **CASE NO.  2:12-CV-2691-SLB** |
| **TACALA, L.L.C., doing business as Taco Bell,** ) ) ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on plaintiff's Motion for Conditional Certification of Collective Action Pursuant to 29 U.S.C. § 216(b) and to Issue Notice.  (Doc. 28.)[1]  Plaintiff Rachel Hilley has sued her former employer, defendant Tacala, L.L.C., alleging violations of the Fair Labor Standards Act.  She has filed a Motion for Conditional Certification of a Collective Action, in which she asks the court to allow her to proceed with a collective action and to issue notice to similarly-situated current and former employees of defendant.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiff's Motion for Conditional Certification of Collective Action Pursuant to 29 U.S.C. § 216(b) and to Issue Notice, (doc. 28), is due to be denied.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## I.  STANDARD FOR CERTIFICATION OF A COLLECTIVE ACTION

The FLSA authorizes a collective action under the following conditions:

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees **similarly situated**.  No employee shall be a party plaintiff to any such action unless **he gives his consent in writing** to become such a party and such consent is filed with the court in which such action is brought.

29 U.S.C. § 216(b).[2]  A district court, in its discretion, may conditionally certify a collective action when to do so would permit the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity."  *Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 169-170 (1989).  "A plaintiff has the burden of showing a 'reasonable basis' for [her] claim that there are other similarly[-]situated employees."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008)(citations omitted).  "The FLSA itself does not define how similar the employees must be before the case may proceed as a collective action.  And [the Eleventh Circuit has] not adopted a precise definition of the term."  *Id*. at 1259.   The Eleventh Circuit, however, has stated that "a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal 'similarly-situated' requirement of § 216(b).  *Hipp v. Liberty Nat. Life Ins. Co.,* 252

---

[2]A collective action under § 216(b) differs from a Rule 23 class action in that an individual does not become a party to the § 216(b) case unless and until he gives his consent in writing to become a party, i.e. "opts-in" to the action, whereas a party must affirmatively "opt-out" of a case proceeding as a Rule 23 class action.  *See Haynes v. Singer Co.*, 696 F.2d 884, 885 (11th Cir. 1983); *see also Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).

F.3d 1208, 1219 (quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir.1996)). Nevertheless, a plaintiff "must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions . . . ." *Marsh v. Butler County Sch. Sys.,* 242 F. Supp. 2d 1086, 1093 (M.D. Ala. 2003); *see also Fox v. Tyson Foods, Inc.*, No. 4:99-CV-1612-VEH, 2006 WL 6012784, at *4 (N.D. Ala Nov. 15, 2006); *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *3 (N.D. Ga. July 25, 2006); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270 (M.D. Ala 2004).

The Eleventh Circuit has held that "before facilitating notice, a district court should satisfy itself that there are other employees who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Morgan*, 551 F.3d at 1259-60 (internal quotations and citation omitted).

> The initial issue is whether Plaintiffs have made the requisite showing to justify conditional certification of a nationwide collective action and court-authorized notice. In *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208 (11th Cir. 2001), the Eleventh Circuit "suggest[ed]" a "two-tiered approach to certification of § 216(b) opt-in classes" to assist district courts in resolving the similarly situated inquiry. *Id*. at 1219. Under the first tier, which is labeled the "notice stage," the district court must decide, "usually based only on the pleadings and any affidavits which have been submitted[,] ... whether notice of the action should be given to potential class members." *Id*. at 1218 (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84, (2003)). Before notice is given, a "district court should satisfy itself that there are other employees of the [defendant-] employer who desire to 'opt-in' and are 'similarly situated'. . . ." *Dybach v. State of Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991).

3

*Devries v. Morgan Stanley & Co.*, No. 12-81223-CIV, 2014 WL 505157, *2 (S.D. Fla. Feb. 7, 2014).

In this case, the parties were allowed significant time to conduct discovery on the issues for conditional certification and notice.[3]   Therefore, "[t]his case is in a slightly different posture than that envisioned in *Hipp* as the first stage, or 'notice stage,' and thus a more searching standard of review is appropriate." *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004)(citing *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002); *Brooks v. BellSouth Telecommunications, Inc.*, 164 F.R.D. 561, 566 (N.D. Ala. 1995)).   This court takes seriously its "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Brooks*, 164 F.R.D. at 567. Plaintiff "will not be permitted to rely on allegations in [her] Complaint.  Rather, [she] must rely on evidence, and all the evidence will be considered, not just [plaintiff's evidence]." *Pickering v. Lorillard Tobacco Co.*, 10-CV-633-WKW, 2012 WL 314691, *9 (M.D. Ala. Jan. 30, 2012).

## II.  <u>STATEMENT OF FACTS</u>

Defendant, Tacala, L.L.C., owns and operates 226 Taco Bell restaurants in eight states:  Alabama, Georgia, Illinois, Kentucky, Missouri, North Carolina, Tennessee, and Virginia.  (Doc. 41-1 at 39.)  Plaintiff's proposed opt-in class consists of approximately

---

[3]The court entered a bifurcated scheduling order allowing the parties significant time to engage in discovery before plaintiff was required to file a Motion for Conditional Certification.  (*See* docs. 16, 21; *see also* docs. 9, 12.)

15,229 "Team Members" – hourly and non-exempt employees – employed by defendant over the last three years.  (*Id*. at 40; doc. 1 ¶ 14.)

Plaintiff, Rachel Hilley, worked for defendant from February 2012 until May 2012, at the Valleydale Taco Bell restaurant, Store # 28006, as well as the Highway 280 restaurant, Store # 22749, and the Helena restaurant, Store #26054; the Valleydale restaurant was her "home store."  (Doc. 30-3 ¶ 3 and at 17; doc. 41-1 at 40.)  These restaurants are part of defendant's Birmingham Market in the Birmingham, Alabama area.  (Doc. 41-1 at 40.)

Plaintiff filed six Plaintiff Consent Forms for other Team Members – Meriem Bellal, (doc. 26); Javon Freeman, (doc. 27); Holland Martin, (doc. 24); Brandon Todd, (doc. 23); Ben Turner, (doc. 22); Joshua White, (doc. 25).  Valleydale was the home store for Turner. (Doc. 30-5 ¶ 4).  Freeman's home store was the Hoover restaurant, (doc. 30-7 ¶ 4), and White's home store was the Highway 280 restaurant.  (Doc. 30-4 ¶ 4.) At different times, Todd's home stores were the Helena restaurant, the Hoover restaurant, and the Valleydale restaurant.  (Doc. 30-6 ¶ 4.)  All of these stores are in the Birmingham Market.  Plaintiff did not submit home store information for Bellal or Martin.

Defendant's written policies regarding pay are as follows:

## Hourly:  Pay for Hours Worked

*Hourly Team Members must be paid for ALL hours worked.  "Hours worked" include all time a Team Member is required to be on duty, on the restaurant premises, or at another designated workplace.*

*Hours worked also include all time a Team Member is allowed to work, even if he or she is not scheduled or required to do so by the employer.*

5

• All Team Members are responsible for complying with the policy on pay for hours worked.

**Examples of Hours Worked**

The following are examples of situations that qualify as "hours worked:"

- Rest breaks and meal periods of less than 30 minutes
    - All non-exempt employees must be paid for interrupted breaks
    - Following an interruption, all non-exempt employees must receive an uninterrupted break in accordance with state law
. . .
- Traveling as part of a day's work
. . .
- Work performed prior to or after a scheduled shift ("unauthorized work")
- Time spent closing, even if already clocked out
. . .
- "Report in" time (time between the start of a scheduled shift and the Team Member's clock-in time)

*Be sure to refer to your state laws because many states have additional requirements for "hours worked."*

**Examples of Non-Working Hours**

The following are examples of situations that do not qualify as "hours worked," and are therefore unpaid:

- Meal periods of 30 minutes or more during which the Team Member is free from duty
. . .
- Traveling from home to work or from work to home
- Waiting between split shifts, if the time is long enough for the Team Member to use effectively as he or she wishes

. . .

The following are examples of non-working hours that must be paid:

6

• Jury duty, military leave, and voting time (only in states where required by law; check your state law).
• For shifts of less than two hours, or when a Team Member is sent home due to lack of work, the Team Member should be paid for at least two hours (Refer to state law; some states have additional requirements.).

**Recording Hours Worked**

You must record ALL hours worked by any hourly Team Member in the Time and Attendance System (TAS), regardless of the circumstances or length of time worked.  TAS automatically calculates overtime hours according to the state laws where the restaurant is located.

. . .

To ensure that you comply with Taco Bell's policy on payment for hours worked, you must:

• Post any required local, state, and federal regulations that govern payment of regular and overtime hours.
• Understand the federal and state laws that apply to your store.
• Contact your Human Resources Department if you have any questions about wage and overtime payments.
• Record all hours worked in TAS.
. . .

# Hourly:  Overtime

*Federal law requires you to pay hourly Team Members 1.5 times their regular rate of pay for all hours worked in excess of 40 hours in a single work week. Overtime does not apply to salaried Team Members.*

. . .

• [Restaurant General Managers] are responsible for complying with federal and state laws governing overtime pay.
• All hourly Team Members are responsible for notifying the [Manager in Charge] when their scheduled work shift is over.

7

. . .

**Work Week and Work Day**

When calculating overtime hours and pay, you must use a single work week – seven consecutive 24-hour periods, beginning on Wednesday and ending on Tuesday.

. . .

The following practices are STRICTLY FORBIDDEN:

- Averaging a Team Member's hours over two or more work weeks to avoid or minimize overtime pay.
- "Rolling" hours from one work day or week to the next to avoid or minimize overtime pay.
- Altering the start and/or end of a work day to avoid daily overtime obligations.
- Granting "compensation" time in lieu of overtime pay.
- Paying Team Members as vendors out of the voucher fund for maintenance work that would otherwise be overtime.
- Any other similar improper practices designed to avoid or minimize overtime pay.

**Regular Rate of Pay**

For purposes of calculating overtime pay, "regular rate" of pay covers all pay for employment, including hourly wages plus:

- Awards and prizes for quality, quantity, or efficiency of work
- Bonuses based on quality, quantity, or efficiency of work
- Shift or "dirty-work" premiums

A Team Member's regular rate of pay does not include expense reimbursements. bonuses you optionally grant, special gifts, vacation or holiday pay, or severance pay.

8

**Unauthorized Overtime**

If a Team Member works overtime hours not scheduled or requested by you, those hours are still considered time worked, and you must pay the Team Member at overtime rates.  However, you may treat this type of incident as a performance issue and provide the Team Member with coaching, counseling, or constructive discipline.

(Doc. 48-1.)

Defendant's written policy requires every Team Member to clock in and to clock out for his or her shift and for meal periods.  (Doc. 41-1 at 41.)  Defendant trains its employees "that they are prohibited from working off the clock and that they may only perform work [if] they are clocked in."  (*Id*. at 41.)  At the end of the shift, each Team Member receives a daily time record, which shows the total hours worked that day.  (Doc. 30-3 ¶ 5.)  Team Members are responsible for keeping up with their daily times and comparing them to the Paycheck Verification Report [PVR].  (Doc. 41-1 at 41.)  "After employees review the PVR, they are instructed to either sign the PVR acknowledging that the stated hours are correct or to write the correct hours on the report and tell their manager or Human Resources about the mistake."  (*Id*. at 42.)  "[E]mployees who do not sign the PVR will still receive their paycheck on the pay date."  (*Id*.)

In support of her Motion, plaintiff alleges defendant has three illegal policies or practices that violate the FLSA:  (1) defendant "regularly 'shaved' or failed to record hours worked by its 'Team Members,'" (2) defendant failed to pay Team Members for time spent traveling between stores, and (3) defendant failed to pay Team Members for meal periods of

less than 30 minutes.  (Doc. 44 at 8.)  She contends, "[B]ecause Tacala stores operated on very thin profit margins – with cost variables limited to supplies and labor – all Tacala managers were told to operate their stores using as little overtime as possible and to generally keep labor budgets down." (Doc. 29 at 10 [citing, *inter alia*, doc. 35-1 at 67; doc. 36-1 at 16-17].)  With regard to manager bonuses, Javier Maravi, defendant's Vice President of Operations, testified as follows:

> 9.  Tacala managers are eligible to receive monthly bonuses that are based on several different factors.
>
> a.  Under Tacala's bonus system, managers are generally assessed in five different performance areas that each make up approximately 20% of the formula for the manager's bonus.
>
> b.  These five performance areas evaluated for to determine eligibility for bonus are profit [–] RAF ("recommend a friend") scores, speed of service, the number of customer complaints received through the 1-800 Taco Bell complaint line, and customer service in the restaurant.
>
> c.  Only 20% of the total bonus formula is allocated to "profit," and labor costs are weighted at only 30% within the  profit allocation (which amounts to 6% of the bonus formula).
>
> d.  I have never disciplined any manager based on labor costs or failure to meet a labor budget, and I do not know of any manager who has been denied a bonus based on labor costs.

(Doc. 41-1 at 44.)

## A.  Shaving Hours or Failing to Record Team Members' Hours

Plaintiff contends:

The declarations of Ms. Hilley, Mr. White, Mr. Turner, and Mr. Todd confirm that Tacala did not pay them all wages owed.  Specifically, all four declarants state that Tacala reduced or shaved employee hours worked in order to save labor costs and avoid paying overtime.  [(Doc. 30-3 ¶ 5; doc. 30-4 ¶ 6; doc. 30-5 ¶ 6; doc. 30-6 ¶ 6.)]

Tacala's own payroll records confirm this testimony.  At the end of a Team Member's shift, he or she receives a daily receipt from the register at which they clock in and out.  This receipt shows the hours worked that shift and their "period to date" hours worked for that pay period.  [(Doc. 35-1 at 37.)] Tacala affirmed that these receipts are the most accurate reflection of the hours worked by Team Members.  [(Doc. 36-1 at 7.)]  And these receipts incontrovertibly show that Team Members were not paid for all hours worked. Instead, the receipts show that Team Members hours were reduced or "shaved" over time.

. . .  The daily receipts for Ms. Hilley on April 9, 2012, show that she worked 32:57 total hours in the "Period to Date."  [(Doc. 30-3 ¶ 5, and exh. A. at 9.)] The next day, however, after working an additional 3.19 hours, her total hours worked in the "Period to Date" were reduced to 30:52.  [image omitted] (*Id.*)

Similarly, hours were also shaved from employee Paycheck Verification Reports ("PVRs").  Team Members are compensated based on the information listed on the PVRs.  [(*See* doc. 35-1 at 44.)]  Tacala's PVRs are supposed to reflect all hours worked at a given store in a pay period.  (*Id.*)  But PVRs were also altered to reduce Team Members' wages.

. . . Ms. Hilley's PVR report for store number 022749 for the pay period of 03/21/12 through 04/03/12 . . . shows that Ms. Hilley worked for 17.73 hours during this time period at the 022749 store. [(Doc. 30-3 ¶ 6 and exh. B at 13.)]  [image omitted]

However, Ms. Hilley's payroll summary shows that she was only paid for 11.88 hours during this pay period for a total of $95.04 instead of $141.84

(17.73 hours × $8.00 per hour).  [(Doc. 30-3 ¶ 6 and exh.  C at 17.)]  In other words, she was shorted $46.80.[4]  [image omitted]

Opt-in class members confirm, by declaration, that Team Members who worked at various Tacala stores were also subject to time shaving by Tacala managers in order to save labor costs.  [(Doc. 30-3 ¶¶ 5, 6; doc. 30-4 ¶ 6; doc. 30-5 ¶¶ 6, 7; doc. 30-6 ¶¶ 6, 7.)]  These class members further testify that Tacala trained its managers to reduce employee hours worked in order to avoid paying overtime and generally save labor costs.[5]  [(Doc. 30-3 ¶ 7; doc. 30-4 ¶ 7; doc. 30-5 ¶ 8; doc. 30-6 ¶ 8.)]

Perhaps the most damning confirmatory evidence is Tacala's admission that within the past 12 months at least three different managers for multiple Tacala stores, in different states, were fired for shaving time from employee hours worked.[6]  [(Doc. 36-1 at 29.)]

. . .

Ms. Hilley and the opt-in plaintiffs further testify that when Team Members were "lent" to understaffed stores other than their "home" stores, they were often not paid for all the hours worked at the other stores because

---

[4]Contrary to plaintiff's testimony, the Transaction Inquiry Report shows that Hilley was paid for a total of 17.73 hours worked at store number 22749 – 11.88 hours one week and 5.85 hours the following week, which is the exact number of hours she claims she worked at store number 22749.  (Doc. 30-3 at 17; doc. 41-1 at 42.)

[5]Plaintiff testified, "My understanding from one of the shift leaders at my store was that Tacala supervisors were trained to shave hours worked by employees and to change the time records to show meal breaks that were never actually taken, in order to keep labor costs low and avoid paying overtime."  (Doc. 30-3 ¶ 7.)  The opt-in plaintiffs gave similar or identical testimony.  (*See* doc. 30-4 ¶ 7; doc. 30-5 ¶ 8; doc. 30-6 ¶ 8.)  Yet, no one has identified the anonymous shift leaders.  The court has not considered this evidence.

[6]Contrary to plaintiff's argument, the fact that defendant has terminated three General Managers for shaving or deleting Team Members' hours does not support an inference that defendant had a policy of allowing General Managers to shave or delete hours.  Therefore, the court has not considered evidence of the termination of three General Managers to support plaintiff's claim that defendant encouraged General Managers to work their employees off the clock.

the other stores regularly did not record their hours worked.  [(Doc. 30-3 ¶ 10; Doc. 30-4 ¶ 9; Doc. 30-5 ¶ 10; Doc. 30-6 ¶ 11.)]

(Doc. 29 at 10-13 [footnotes added].)

Maravi testified that only the Valleydale restaurant accumulated time worked during a pay period on its daily time records; no other restaurant accumulated hours worked during a pay period on the daily time records.  (Doc. 41-1 at 62.)

### 1. Rachel Hilley.

Plaintiff, Rachel Hilley, testified that she "often worked more than 40 hours per week even though [she] was scheduled to work much less, and [she] usually worked 5-6 shifts per week." (Doc. 30-3 ¶ 4.)  In her Declaration, she stated, " I noticed that, without explanation, the number of hours recorded from one day to the next during the pay period decreased and did not accurately reflect the total number of hours I worked.  I also noticed that my wage statements did not accurately reflect the number of hours I worked during the pay period since I was paid for fewer hours than I actually worked, which my time record receipt showed." (*Id*. ¶ 5.)  She also testified that her PVRs were often inaccurate and, therefore, she refused to sign them.  (*Id*. ¶ 6.)  Her PVRs often showed more hours than her paychecks.  (*Id*.)  Despite access to her pay history, Hilley has not identified any particular incidence of missing time, except from her April 11, 2012, paycheck.  Yet, she estimates that she was not paid for 10 to 20 hours each week throughout her employment.  (*Id*.)  Two to three times a week, plaintiff was asked to work at other stores; she testified that she was often not paid for hours worked at these other stores.  (*Id*. ¶ 10.)

13

As set forth above, plaintiff contends that she was not paid for 5.85 hours she worked at store number 22749.  (*See* doc. 29 at 11-12.)  However, Transaction Inquiry Report attached to her Declaration clearly shows that these hours were included in her paycheck dated April 11, 2012.  (Doc. 30-3 at 17.)

### 2. Javon Freeman.

Freeman testified that he worked 30-40 hours per week and each shift was about seven hours.  (Doc. 30-7 ¶ 5.)  He does not allege that time was deleted from his hours worked as shown on his PVR or the period-to-date of his daily time record.  (*See* doc. 30-7 ¶ 6.)

### 3. Brandon Todd.

Todd testified that he worked five shifts per week that usually totaled more than 40 hours per week.  (Doc. 30-6 ¶ 5.)  He testified, "I noticed that, without explanation, the number of hours recorded from one day to the next during the pay period decreased and did not accurately reflect the number of hours I worked during the pay period since I was paid for fewer hours than I actually worked, which my time record receipt showed." (*Id*. ¶ 6.)  He also contends that he was not always paid for hours worked at stores other than his home store.  (*Id*. ¶ 11.)  He has estimated that he was not paid for 10-20 hours per week.  (*Id*. ¶ 7.)  He testified that he had complained to his Area Coach, who told him that he would be paid for the hours worked, but he was never paid for this time.  (*Id*. ¶ 9.)

The court notes that Todd worked at three restaurants including Valleydale.  Only the Valleydale restaurant showed accumulated hours on its daily time records.  (Doc. 41-1 at 46.)

14

Therefore, the court assumes that Todd's testimony regarding missing accumulated time refers to an incident or incidents occurring at the Valleydale restaurant.

### 4. Ben Turner.

Turner testified that he worked five shifts a week for a total of 30-34 hours per week. (Doc. 30-5 ¶ 5.)  He testified that he noticed his hours for the pay period decreased during the pay period and that his PVR was often inaccurate.  (*Id*. ¶¶ 6-7.) Also, he testified that his paycheck often contained fewer hours than reflected on the PVR; (*id*. ¶ 7), but he did not provide specific details.  Also, he testified that he was not paid for one shift worked at a location other than his "home" store.  (*Id*. ¶ 10.)  However, Turner did not testify when he worked this unpaid shift or any other details of the incident.

### 5. Joshua White.

White testified that he worked 30-40 hours per week.  (Doc. 30-4 ¶ 5.)  Also he testified, "I noticed that, without explanation, the number of hours recorded during the pay period decreased and did not accurately reflect the total number of hours worked.  I also noticed that my wage statements did not accurately reflect the number of hours I worked during the pay period, and I was paid for fewer hours than I actually worked."  (*Id*. ¶ 6.) White has not identified any specific details of these incidents, such as the dates of the discrepancy and the number of hours lost.  He testified that he understood that defendant "failed to record and pay its Team Members for hours worked at restaurant locations other than their 'home' store," but he does not allege that this happened to him.  (*Id*. ¶ 9.)

15

As set forth above, no restaurant other than Valleydale accumulated hours during a pay period, (doc. 41-1 at 46), and White's declaration does not dispute this fact. Therefore, the court considers White's testimony that his hours worked during a pay period, as reflected on his daily time records, decreased during the pay period only for work performed at the Valleydale store.[7]

## B.  Meal Periods

Plaintiff contends –

Tacala's system-wide policies and the FLSA state that all employees are to be paid for time spent on breaks of less than 30 minutes.  [(Doc. 35-1 at 35-36; doc. 48-1 at 1.)]  Once again, Tacala's payroll records show that this pay requirement was systematically violated.  Furthermore, class member testimony establishes that Team Members were often called back to work by their supervisors before they could take a full 30 minute meal break, and that Tacala did not pay them for this time.  [(Doc. 30-3 ¶ 9; doc. 30-4 ¶ 8; doc. 30-5 ¶ 9; doc. 30-6 ¶ 10; doc. 30-7 ¶ 7.)]  For example, one of Ms. Hilley's daily receipts shows a meal break of 27 minutes, but her PVR shows that she was not compensated for this time. . . . Ms. Hilley's daily receipt of hours worked for April 10, 2012[,] . . . shows that she clocked-in at 5:08 p.m. and clocked-out at 8:27 p.m. for a total of 3 hours and 19 minutes worked.  The receipt also shows that she took a 27 minute meal break during this shift. [(Doc. 30-3 ¶ 5 and exh. A at 9.)  Image omitted.]

Rather than paying her for her break of less than 30 minutes, Ms. Hilley's PVR shows that Tacala deducted 27 minutes from her hours worked . . . and paid her for only 2.87 hours on that day.  [(*Id*. ¶ 6 and exh. B at 14.) Image omitted.]

Moreover, other Team Members confirm that what happened to Ms. Hilley on April 10, 2012[,] was not an isolated incident.  Team Members at multiple Tacala locations were similarly not compensated for breaks of less

_____

[7]White's home store was the Highway 280 restaurant.

than 30 minutes.  [(Doc. 30-3 ¶ 9; doc. 30-4 ¶ 8; doc. 30-5 ¶ 9; doc. 30-6 ¶ 10; doc. 30-7 ¶ 7.)]

(Doc. 29 at 15-16 [original footnote omitted].)

Defendant's written policy is to compensate Team Members for meal breaks that do not last at least 30 minutes.  (Doc. 48-1 at 1-2.)

**1. Rachel Hilley**.

Plaintiff testified that she "was not paid for meal breaks that were less than 30 minutes even though [she] was supposed to get paid for them."  (Doc. 30-3 ¶ 9.)  She has presented evidence that she was not paid for meal periods lasting for less than 30 minutes on two occasions:  one on April 10, 2012, lasting 27 minutes, (doc. 30-3 at 9), and one on April 17, 2012, lasting 26 minutes, (*id*. at 11).

**2. Javon Freeman**.

Freeman testified, "As I recall, I was not paid for meal breaks that were less than 30 minutes even though I was supposed to be paid for them."  (Doc. 30-7 ¶ 7.)  He does not offer any testimony as to the circumstances surrounding these unpaid meal periods.

**3. Brandon Todd**.

Todd testified, "Often . . .my meal breaks were interrupted and were actually less than 30 minutes long.  As I recall, I was not paid for meal breaks that were less than 30 minutes even though I was supposed to get paid for them."  (Doc. 30-6 ¶10.)   He does not offer any testimony as to the circumstances surrounding these unpaid meal periods.

17

**4. Ben Turner**.

Turner testified, "As I recall, I was not paid for meal breaks that were less than 30 minutes even though I was supposed to get paid for them." (Doc. 30-5 ¶ 9.)   He does not offer any testimony as to the circumstances surrounding these unpaid meal periods.

**5. Joshua White**

White testified, "Often . . . my meal breaks were interrupted and were actually less than 30 minutes even though I was supposed to get paid for them.  Moreover, when my meal breaks were interrupted, I was told not to clock back in until 30 minutes, so I was not paid for this off-the-clock time." (Doc. 30-4 ¶ 8.)  White is the only plaintiff or opt-in plaintiff to testify that he was told not to clock in until 30 minutes after he clocked out for a meal period.

**C. Travel Time**

Plaintiff contends:

> Tacala also failed to pay Team Members for time spent traveling from one store to another at management's direction.  [(Doc. 30-3 ¶ 10; doc. 30-5 ¶ 10; doc. 30-6 ¶ 11; doc. 30-7 ¶ 11.)]  In fact, such time was not even recorded.  [(Doc. 30-3 ¶ 10; doc. 30-5 ¶ 10; doc. 30-6 ¶ 11; doc. 30-7 ¶ 11.)]  Once again, an example of Tacala's FLSA violation can be seen in Ms. Hilley's payroll records and hour summary receipts.  Tacala's daily time records show that, on April 2, 2012, Ms. Hilley clocked-in at store number 028006 at 2:00 p.m.  [(Doc. 30-3 ¶ 5 and exh. A at 10.)]  She then clocked-out two minutes later at 2:02 p.m. and traveled to store number 022749, where she clocked in at 2:35 p.m.  [image omitted.]
>
> Neither the daily time receipts above[, (Doc. 30-3 ¶ 5 and exh. A at 10),] nor Ms. Hilley's PVRs[, (doc. 30-3 at ¶ 6 and exh. B at 13),] account for the [33] minutes that she spent traveling between stores.  Ms. Hilley was only

18

paid for the 2 hours and 17 minutes she worked at store number 022749 plus the additional two minutes she was clocked in at store number 028006, or 2.[28] hours.  [image omitted.]

Although [Maravi testified] that travel time should be accounted for in the time records of the second location[, (doc. 35-1 at 47-48)], Tacala's own records show otherwise.  In this example, store number 022749 should have adjusted Ms. Hilley's clock-in time to 2:02 p.m. to account for the [33] minutes that Ms. Hilley spent traveling from store number 028006 to 022749. It failed to do so.  Other Team Members also testified that Tacala did not compensate them for travel time between stores.  [(Doc. 30-3 ¶ 10; doc. 30-5 ¶ 10; doc. 30-6 ¶ 11; doc. 30-7 ¶ 11.)]

(Doc. 29 at 13-14 [footnote added].)

Maravi testified that defendant's policy regarding compensation for travel time is as

follows:

12.  On occasion, employees who want to work additional hours may volunteer to work split shifts at restaurant locations other than the employee's home location; for example, an employee may choose to work a morning shift at his or her home restaurant location, go home for several hours in the afternoon, and then return to work a night shift at another location.

a.  Employees who work shifts at other restaurant locations are assigned a temporary identification number that allows them to record their hours worked as a "borrowed employee."

b.  Although the borrowed employee's hours are shown separately on each individual restaurant's PVR, the hours worked are consolidated by Tacala's payroll department each pay period so that the employee only receives one paycheck for the total time worked at all restaurant locations.

c.  When additional work is available, employees may be allowed to work at second shift later in the day at a different store.

d.  Typically, the second shift will start more than an hour after the first shift ends.

e. When an employee has volunteered for a shift at another store later in the day, Tacala does not pay the employee for the time between shifts when the employee clocked out at the first store and the time when the employee clocks in later in the day at the second store.

f. During the time between shifts at the two different stores, the employees [are] relieved from duty and can go where he or she pleases. This time is not spent for Tacala's benefit.

g. Tacala pays employees for all travel time incurred for the company's benefit:

i. At Tacala stores it is extremely rare that an employee would be asked to report directly from one store to work at another store.

ii. If an employee is asked to report from one store to another store the employee is paid for the travel time between the two stores.

iii. If that occurs, the RGM [Restaurant General Manager] at the store to which the employee reports is directed to bridge the time from when the employee clocked out at the previous store so that the employee is paid from the time he left the previous store until the time he finishes work at the new store.

(Doc. 41-1 at 48-50.)

**1. Rachel Hilley**.

In her Declaration, plaintiff testified:

I agreed and worked shifts at Tacala's Helena, Hwy 280, and Trussville Restaurant locations. If I was already working at my 'home' store when asked to work at another store, Tacala required me to clock out from my 'home' store and drive to the other location off-the-clock. I was not paid for this travel time.

20

(Doc. 30-3 ¶ 10.)  The only example of plaintiff traveling between stores after clocking in at her home store was a single incident in which plaintiff clocked out from the Valleydale store, her "home" store, after two minutes and clocked in at the Highway 280 store 33 minutes later.  (*See id*. ¶ 10 and exh. A at 10.)  The distance between the two stores is about 4.8 miles.  (Doc. 41-1 at 40.)  Plaintiff does not explain why it took her over 30 minutes to drive less than 5 miles.

### 2.  Javon Freeman.

Freeman testified:

> During my employment, I was asked to work at Tacala's Helena restaurant location.  I arrived for my scheduled shift at my 'home' store but, before clocking in, my manager drove me to the Helena location.  I was not paid for this travel time.  Because this was not my 'home store', I could not clock in.  Tacala claims to have recorded my time worked at the Helena location, however, I had no way to verify that the hours I worked at the store were accurately recorded, as I did not receive a record of my hours worked.[8]

(Doc. 30-7 ¶ 8 [footnote added].)   The distance between the Hoover restaurant and the Helena restaurant is approximately 8.4 miles.  (Doc. 41-1 at 40.)  Freeman does not indicate the amount of travel time he lost.

### 3.  Brandon Todd.

Todd testified:

---

[8]The court notes that Freeman could have verified that he was paid for these hours by comparing the total number of hours shown on his PVR with the actual number of hours he worked.  The possession of a daily time record is not the only way to verify that he was paid for the correct number of hours.

> Approximately once per week, my supervisors asked me to cover shifts at other stores that were understaffed.  Because I'm a team-player, I agreed to do so and often worked shifts at Tacala's Alabaster, Trussville, and McCalla restaurant locations.  If I was already working at my 'home' store when asked to work at a another store, Tacala required me to clock out from my 'home' store and drive to the other location off-the-clock.  I was not paid for this travel time.  Tacala recorded my time worked at other locations using handwritten time cards.  However, I often was not paid all or some of the hours worked at the other store locations.

(Doc. 30-6 ¶ 11.)  He did not testify how often he was called upon to work at another store after clocking in at his home store, and he has not indicated whether he was asked to work a split shift or otherwise relieved of work for a significant period of time before clocking in at the second restaurant.

**4. Ben Turner**.

Turner testified, "During my employment, I was required to cover a shift at Tacala's Hwy 280 location.  My Manager required me to first clock out from my 'home' store and to then drive to the other location off-the-clock.  I was not paid for this travel time."  (Doc. 30-5 ¶ 10.)  Turner did not provide the specifics of this incident or indicate the amount of travel time he lost.

### III.  DISCUSSION

Plaintiff's Complaint alleges two claims – Count One for unpaid minimum wages and Count Two for unpaid overtime compensation.  Her Complaint states:

> 21.  Plaintiff is informed and believes, and thereon alleges, that Team Member employees were not paid for all hours worked because all hours worked were not recorded.

22

. . .

28.  At all material times set forth herein, Defendant failed to pay Plaintiff and class members for all hours worked.  On information and belief, Defendant has a policy and/or practice of refusing to pay overtime wages and reduce labor costs that resulted in hours being shaved off of Plaintiff and class members' records.  Defendant had a practice and/or policy of reducing hours that were recorded as being worked by erasing those hours in Defendant's computers, or altering the hours worked in order to make them less.  Defendant also would send Plaintiff and other class members to various Taco Bell restaurants and provide them new clock-in identification numbers and then not track or pay the hours worked in other Taco Bell locations, resulting in lost wages.  In addition, although Defendant maintains a break policy to allow for 30 minute unpaid meal breaks, Defendant would require Plaintiff and class members to work through all or part of those meal breaks while off-the-clock.

. . .

34.  At all material times set forth herein, Plaintiff and class members had some work weeks in which they worked over forty hours in one week.  However, as set forth above, Plaintiff and class members were not paid for all hours worked as Defendant shaved or erased hours they worked and required Plaintiff and class members to work through all or part of the meal periods for which they were scheduled.  To the extent those off-the-clock hours caused their total hours to exceed forty in one week, they are owed overtime wages for those hours worked.

(Doc. 1 ¶¶ 21, 28, 34.)

In support of her Motion, plaintiff alleges defendant "has three illegal policies or practices that are the direct result of its policies of minimizing labor costs and overtime, and of incentivizing managers to stay within Tacala's strict labor budgets" – (1) defendant "regularly 'shaved' or failed to record hours worked by its 'Team Members,'" (2) defendant failed to pay Team Members for time spent traveling between stores, and (3) defendant failed to pay Team Members for meal periods of less than 30 minutes.  (Doc. 44 at 8.)

23

## A.  OTHER EMPLOYEES DESIRE TO OPT IN

"Before determining to exercise [its power to conditionally certify this collective action and to facilitate notice to the class] on application by [plaintiff] . . . , the district court should satisfy itself that there are other employees of [defendant] who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991).  Six current and former employees of defendant have filed opt-in notices.  (*See* docs. 22-27.)  Four of these opt-in plaintiffs have filed declarations.  (Docs. 30-4 to 30-7.)  "Where consents to participate in the suit have already been filed[,] district courts in the Eleventh Circuit have found that, for purposes of deciding a motion for conditional collective action certification, the already-filed consents to opt-in established that there were persons who would join in the suit if they had notice of the suit." *Billingsley v. Citi Trends, Inc.*, No. 4:12-CV-0627-KOB,  2013 WL 246115, *2 (N.D. Ala. Jan. 23, 2013)(quoting *Barron v. Henry Cty. School Sys.*, 242 F. Supp. 2d 1096, 1101 (M.D. Ala. 2003))(internal quotation and alterations omitted).

For purposes of deciding plaintiff's Motion, the court will assume that there are other employees who desire to opt-in.  However, because all the consents to opt-in were filed by employees from the Birmingham area, the court makes no assumption that employees outside the Birmingham Market desire to participate in this case.

24

## B. SIMILARLY-SITUATED EMPLOYEES

Before the court certifies a collective action and facilitates notice, it must be satisfied

that other employees are "'similarly situated' with respect to their job requirements and with

regard to their pay provisions." *Dybach*, 942 F.2d at 1568.

> In the absence of a concrete definition of "similarly situated," *see
> Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259-60 (11th Cir.
> 2008)("[W]e have not adopted a precise definition of ['similarly situated']. .
> . . [W]e [have] explained what the term does not mean – not what it does."),
> courts have looked to a variety of factors, including [1] job title; [2]
> geographic location; [3] the temporal proximity of the FLSA violations
> alleged; [4] the nature and decisional source of any contested policies and
> practices; and [5] the similarity of treatment given to the various plaintiffs and
> potential opt-in plaintiffs by the defendant. *See Smith* [*v. Tradesmen Intern.,
> Inc.*], 289 F. Supp. 2d [1369,] 1372 [(S.D. Fla. 2003)]. However, such general
> factors provide little concrete guidance; the court's decision must be the result
> of a fact-intensive inquiry. *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d
> 1095, 1105 (10th Cir. 2001)(referring to the Eleventh Circuit's approach to
> similarly situated determinations as "ad hoc").

*Hogan v. Allstate Beverage Co., Inc.*, Civil Action No. 2:10cv390-MHT, 2012 WL 6027748,

*4 (M.D. Ala. Dec. 4, 2012). Nevertheless, the point of this exercise is to determine whether

plaintiff has "demonstrate[d] a reasonable basis for [her] claim of class[-]wide

discrimination." *Maudlin v. Johnny Kynard Logging, Inc.*, Civil Action No. 08-0307-KD-C,

2009 WL 455479, *2 (S.D. Ala. Feb. 20, 2009)(quoting *Hipp v. Liberty Nat'l Life Ins. Co.*,

252 F.3d 1208, 1219 (11th Cir. 2001))(internal quotations omitted). However –

> the mere fact that violations occurred cannot be enough to establish similarity,
> as that would not ultimately be sufficient to establish a pattern and practice
> without a showing that the violations were more than sporadic occurrences.
> To conclude otherwise, that is, to conclude that it is enough to demonstrate that
> employees are similarly situated simply to say that they claim violations of the

law by the same employer, is to conclude that any time an employer had two or more employees who allegedly were not being paid the overtime they claimed they were due, the employees would be similarly situated and be allowed to proceed with a collective action.  While plaintiffs certainly are not required to prove by a preponderance of the evidence a pattern and practice at the notice stage, ***because there is no requirement of a motivating discriminatory animus in an FLSA case a pattern in such a case must stem from some other formal or informal policy***.

*Marsh v. Butler County School System*, 242 F. Supp. 2d 1086, 1094 (M.D. Ala. 2003)(footnote omitted; emphasis added).

### 1.  Job Title

Plaintiff seeks to join the claims of "Team Members."  A Team Member position is an entry level position in either food preparation or customer service.  These positions are hourly, non-exempt positions.

The court finds that plaintiff and the members of the proposed collective action share the job title of Team Member.  This factor weighs in favor of certifying a class.

### 2.  Geographic Location

Plaintiff and the four Team Members who have filed declarations all worked in the Birmingham Market in restaurants just south of Birmingham, Alabama.  Plaintiff proposes a collective action covering all Team Members employed by defendant in its 226 restaurants in Alabama and seven other states.  The court finds that the vast majority of the members of the collective action do not share a geographic location with plaintiff.

Therefore, the court finds this factor weighs against certifying the proposed multi-state collective action.

26

### 3. Temporal Proximity

The members of the proposed collective action worked during the same time period as plaintiff.  Plaintiff seeks to certify a collective action including Team Members employed by defendant during the last three years.

Therefore, the court finds that this factor weighs in favor of certifying the class.

### 4. The Nature and Decisional Source of Contested Policies and Practices

Defendant's written compensation policies are the same in all restaurants it owns and operates.  Therefore, the court finds that plaintiff and the members of the collective action work under the same written policies.  However, plaintiff does not argue that these written policies violate the FLSA.  Rather, she is challenging three practices that she alleges violate these written policies and violate the FLSA.  However, she has not presented sufficient evidence that the practices, which violate defendant's written policies, are systemic and/or class wide.  The decisional sources for the alleged practices appear to be one or more store managers.

Defendant's bonus policy that rewards General Managers for economic performance, is not an illegal policy.  The fact that a particular manager may have been motivated to violate the FLSA and defendant's written polices to inflate his or her bonus does not necessarily create a policy or practice of his employer.  *See Babineau v. Federal Exp. Corp.*, 576 F.3d 1183, 1193-94 (11th Cir. 2009)("[P]roving that [defendant] had a policy of holding its employees to efficiency standards that were difficult to meet would not prove that [it]

required any individual class member to work without pay.").  As noted above, defendant has specific and well defined written policies requiring Team Members to be paid for all hours worked and to be paid overtime for hours worked over 40 per week.  Contrary to plaintiff's assertion, the fact that three General Managers, including plaintiff's General Manager, have been terminated for "shaving hours" does not support an inference that defendant tolerated, encouraged, or rewarded such conduct.  *Cf. Reich v. Department of Conservation and Natural Resources*, 28 F.3d 1076, 1083 (11th Cir. 1994)(noting that record contained no evidence that defendant/employer had taken any action to "discourage the overtime required by the vast majority of its officers," based, in part, on the fact that "no officer was ever disciplined for violating the forty-hour rule").

The court finds that the nature of plaintiff's alleged FLSA violations are isolated and/or sporadic violations of defendant's written policies, and the decisional sources are individual store managers and not company-wide decisionmakers.  Therefore, the court finds that this factor weighs against certifying the proposed collective action.

### 5.  Similarity of Actions that Constitute Violations

Plaintiff has alleged three types of FLSA violations:  (1) defendant's managers shaved hours to avoid paying actual labor costs, (2) defendant failed to pay Team Members for time traveled between stores, and (3) defendant failed to pay for meal periods of less than 30 minutes.  She contends that these "illegal policies or practices . . . , resulting from Tacala's stringent, uniform, and systemwide labor budgeting and manager compensation policies, and

28

[her] sufficiently detailed declarations establish[ ] that potential class members are victims of these illegal policies or practices." (Doc. 44 at 34.) She also contends –

> Given the nature of the fast food restaurant industry, many class members may have worked for Tacala for only a short period of time, with relatively modest individual damages. It would be impractical for those employees to litigate, or for this Court to adjudicate, these matters separately. The benefit of litigating potentially thousands of individual actions together as one collective action clearly outweighs any potential detriment to Defendant in conditionally certifying this case.

(Doc. 29 at 22 [citing *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700 (M.D. Tenn. Sept.26, 2006)].)[9] Contrary to plaintiff's position, judicial efficiency is not served by joining thousands of individual employees' claims together in a single action when the claims of

---

[9]The *Wilks* court held, "Because the plaintiffs' assertions about the ***defendant's purportedly improper time-keeping and pay practices play a predominant role in each of their claims***, any requirement that each plaintiff prove his or her claims individually would ***waste more judicial time and resources than trying their cases individually would preserve***. Although the defendant contends that decertification is necessary to protect its due process rights, these rights must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court." *Wilks*, 2006 WL 2821700 at *8 (emphasis added; internal citation omitted). The *Wilks* case, unlike the present case, concerned allegations of regular, common business practices of the defendant that similarly affected the claims of the members of the collective action. This court has found no decision that allows individual claims whose only common factors are the employer and an FLSA violation not traceable to a pattern or practice of the employer that has allowed notice and conditional certification based solely on considerations of cost to the individual plaintiffs.

Successful FLSA claims allow the employee to recover unpaid wages, liquidated damages, and attorneys' fees and costs. These specific provisions should be adequate to protect the interests of individual employees seeking to vindicate their rights.

those thousands of employees share no common issues of law or fact that can be resolved in a single proceeding.

Because plaintiff has limited her proposed class to these violations, all members of the collective action must have suffered one of these violations. However, "the mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences." *Marsh*, 242 F. Supp. 2d at 1094. Plaintiff must demonstrate a "pattern" of FLSA violations that "stem from [defendant's] formal or informal policy." *Id*.; *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008)("There is nothing unfair about litigating a single corporate decision in a single collective action, especially where there is robust evidence that store managers perform uniform, cookie-cutter tasks mandated by a one-size-fits-all corporate manual."). Plaintiff's allegations and evidence fail to support a finding that the members of the collective action have suffered a wide-spread pattern of FLSA violations or that they were victims of a single corporate decision resulting in across-the-board FLSA violations.

The court finds that the determination of whether a member of the proposed collective action suffered a violation of the FLSA would necessarily require "individualized analysis of the specific minimum wage and overtime compensation violations," an analysis that would be unique to each and every member of the proposed collective action. *See Ledbetter v. Pruitt Corp.*, Civil Action No. 5:05-CV-329 (CAR), 2007 WL 496451, *5 (M.D. Ga. Feb.

30

12, 2007). "Such an individualized analysis runs directly counter to 'the economy of scale' envisioned by collective treatment of similarly situated employees under § 216(b) of the FLSA." *Id.* (citing *Horne v. United Servs. Auto Ass'n*, 279 F. Supp. 2d 1231, 1237 (M.D. Ala. 2003)); *see also Hoffman-LaRoche, Inc.*, 493 U.S. at 170 (FLSA collective action is appropriate when "common issues of law and fact arising from the same alleged . . . activity" can be efficiently resolved in one proceeding).

> [A]lthough the Eleventh Circuit has now made it clear that in this circuit a plaintiff may establish that others are "similarly situated" without pointing to a particular plan or policy, a plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions, because without such a requirement, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.

*Marsh v. Butler County School System*, 242 F. Supp. 2d 1086, 1093 (M.D. Ala. 2003)(citing *White v. Osmose*, 204 F. Supp. 2d 1309 (M.D. Ala. 2002)). "To conclude otherwise, that is, to conclude that it is enough to demonstrate that employees are similarly situated simply to say that they claim violations of the law by the same employer, is to conclude that any time an employer had two or more employees who allegedly were not being paid the overtime they claimed they were due, the employees would be similarly situated and be allowed to proceed with a collective action." *Id.*

Plaintiff alleges that defendant's managers regularly cut Team Members' hours to reduce their labor costs. In her Declaration, she states that her PVR was "often inaccurate" and that she was not paid for 10-20 hours per week throughout her employment. (Doc. 30-3

¶ 6.)  However, she refers to only one specific incident of missing time, in which she contends that she was not paid for all hours worked.  (Doc. 29 at 11-12.)  Plaintiff's claim of not being paid for this time is based on an incorrect reading of the pay documents provided by defendant.  She contends, "The PVR shows that Ms. Hilley worked for 17.73 hours during [the] time period [March 21, 2012, through April 2, 2012] at the 022749 store."  (Doc. 29 at 11 [citing doc. 30-3, exh. B, at 13].)  But, she argues, the "payroll summary shows that she was only paid for 11.88 hours during this pay period for a total of $95.04 instead of $141.84 (17.73 hours × $8.00 per hour).  In other words, she was shorted $46.80. (*id*. at 12 [citing doc. 30-3, exh. C, at 17].)  The "Transaction Inquiry Report," attached as Exhibit C to plaintiff's Declaration lists the check date, the hours or "Units to Pay," store number, and check amount.  (Doc. 30-3, exh. C, at 17.)  The Report indicates ***two entries*** for plaintiff for store 022749 on a check dated April 11, 2012 – one for 11.88 hours and one for 5.85 hours – for a total of 17.73 hours, the amount plaintiff contends she was owed.  (*Id*.; doc. 29 at 12.).  This incident, therefore, provides no support for plaintiff's contention that defendant had a wide-spread and/or unified policy of shaving hours.

The court finds that individualized consideration is required of each Team Members' alleged unpaid or shaved time claims.  Plaintiff has not alleged that Team Members' claims for unpaid time that was purported to have been removed from defendant's payroll system share common questions of law or fact making a collective action appropriate.

Plaintiff also contends that defendant has a practice of not paying employees for travel time between stores.  Under the FLSA –

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in  on or after May 14, 1947 –
>
>> (1)   walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>>
>> (2)  activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.  . . .

29 U.S.C. § 254(a).  However, "Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."  29 C.F.R. § 785.38.  Travel time does not include a bona fide meal period.

In response to plaintiff's Motion, defendant argues:

> Hilley has not provided evidence that Tacala travel policies produce common violations among the proposed class.  Hilley has only produced general, non-specific allegations regarding alleged unpaid travel by four former employees in four stores in the Birmingham area.  Even assuming arguendo she had produced evidence of common allegations of unpaid travel time among the class, the class would not be similarly situated, because Tacala's travel pay policies are lawful, and therefore, resolving any claim would require individualized inquiries into, including, but not limited to, the reason for the travel, the reporting times at the two stores, the length of the travel, and the time available for travel.

33

Under Tacala policy, on the rare occasions that employees report[ing] for work at one store are directed to report to another store, the employees are paid for the travel time between stores. More frequently, however, employees who work at more than one store in a day have volunteered to work an available shift at another store to obtain extra work hours. In these cases, the second shift typically starts several hours after the first, like a morning and night shift. Because employees are relieved from duty between the two shifts and can do as they please, they are not paid for the time between shifts, including any time they spent traveling to the other store.

Tacala's policy is consistent with FLSA regulations, which hold that "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked." 29 C.F.R. § 785.16(a). Because he is entirely freed from duty between the two shifts, the time driving to the second store is ordinary home-to-work time, excluded from compensation under [29 C.F.R.] § 785.35. Whenever an employee reports directly to the other store, he or she is paid for the travel time, but when the employee is voluntarily taking a later shift at another store, the time between shifts is the employee's own time. *See United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1117-18 (10th Cir. 1999)(holding that bus drivers' time between split shifts need not be compensated because they were able to use the time for their own purposes). Therefore, because Tacala's travel policies are lawful, any alleged unpaid travel time claims would involve individualized inquiries into the circumstances of the travel, making the claims inappropriate for certification.

(Doc. 33 at 45-46 [internal citations to the record omitted].)

The court agrees that plaintiff has not alleged a common or widespread policy of requiring employees to travel between stores during the workday without pay. Her evidence details only three incidents – (1) her trip between the Valleydale store and the 280 store, a trip that took her over 30 minutes to travel less than five miles, (2) Turner's trip from the Valleydale store to the 280 store, and (3) Freeman's travel from the Hoover store to the Helena store, a trip that was taken before he began work. These incidents do not share

34

common factors subject to overlapping proof.  Plaintiff's trip, which should have lasted five to ten minutes,  lasted over thirty minutes – long enough to infer she stopped for a meal break or another personal, non-compensable purpose.  Freeman's trip preceded his workday and, therefore, may not be compensable.  Turner testified that he may not have been paid for any time at the 280 store; therefore, defendant's failure to pay may not have been related to an alleged practice of not paying for traveltime – as opposed to an incident of shaving Turner's hours.

The court finds that plaintiff's allegations and evidence do not demonstrate a common practice of requiring employees to travel between stores during a workday and/or a common practice of failing to pay employees for such compensable travel time.  The frequency of such in-shift travel, the timing of the travel before, during, or after a shift, the distance traveled, the time elapsed between leaving one job site and arriving at the second job site, and  whether the Team Member was paid for his or her travel time are factors for the court's consideration and are not subject to uniform proof across the proposed collective action. Therefore, the court finds that plaintiff has not established that all Team Members are similarly situated  with regard to FLSA violations based on workday travel between stores.

Plaintiff alleges that defendant "systematically violated" its policy to pay employees for meal periods of less than 30 minutes.  (Doc. 29 at 14-15.)  She argues, "class member testimony establishes that Team Members were often called back to work by their supervisors before they could take a full 30 minute meal break, and that Tacala did not pay them for this

time." (*Id*. at 15 [citations omitted].)  However, the FLSA does not require defendant to pay

its employees for bona fide meal periods of less than 30 minutes.

The regulations provide:

Bona fide meal periods are not worktime. Bona fide meal periods do not
include coffee breaks or time for snacks. These are rest periods. The employee
must be completely relieved from duty for the purposes of eating regular
meals.  ***Ordinarily 30 minutes or more is long enough for a bona fide meal
period.  A shorter period may be long enough under special conditions.***  The
employee is not relieved if he is required to perform any duties, whether active
or inactive, while eating.  For example, an office employee who is required to
eat at his desk or a factory worker who is required to be at his machine is
working while eating.

29 C.F.R. § 785.19(a) (emphasis added).    The Department of Labor Field Handbook

provides further assistance in determining whether a meal period of less than 30 minutes is

compensable or non-compensable time:

Meal periods of less than 30 minutes during which the employee is completely
relieved for purposes of eating a meal may be bona fide – and thus not hours
worked – when certain special conditions are present (Reg. 785.19).   The
conditions reviewed to make this determination, which should be considered
in context on a case-by-case basis, include:

(a)  Work-related interruptions to the meal period are ***sporadic*** and
***minimal***.

(b) Employees have sufficient time to eat a regular meal.  Periods of
***less than 20 minutes*** should be given special scrutiny to ensure that the
time is sufficient to eat a regular meal under the circumstances
presented.

(c)  The period involved is not just a short break for snacks and/or
coffee but rather is a break to eat a full meal, comes at a time of day or
shift that meals are normally consumed, and occurs with no more
frequency than is customary.

36

(d)   There is an agreement (*e.g.* CBA) between the employees and employer that the period of less than 30 minutes is sufficient to eat a regular meal.

(e)   Applicable State or local laws do not require lunch periods in excess of the period indicated.

Dept. of Labor, *Wage and Hour Division's Field Operations Handbook*, Ch. 31, § 31b23 (Rev. 643 Dec. 15, 2000)(emphasis added).

The court notes and plaintiff does not dispute that defendant requires its employees to clock in and clock out for meal periods.  It deducts the meal period time from employees' hours worked in calculating compensation.  It does not automatically deduct 30 minutes for meal periods on a regular or routine basis irrespective of employees' actual clocked time. *Cf. Kohlheim v. Glynn County*, 915 F.2d 1473 1477 (11th Cir. 1990).  Plaintiff has presented evidence that she had two meal periods of less than 30 minutes – one was 26 minutes and the other was 27 minutes.  She makes no argument that 26-27 minutes – as opposed to 30 minutes – was an inadequate amount of time for her to eat a regular meal, and she does not argue that she was not completely relieved of her duties for the 26 or 27 minutes.  The court finds, if plaintiff was regularly completely relieved of duties for purposes of eating a meal, such sporadic interruptions of 3-4 minutes, resulting in meal periods of more than twenty minutes but less than thirty, did not convert a non-compensable meal period into compensable work time.   Nevertheless, given the fact-intensive nature of the inquiry into whether a particular meal period is compensable time, alleged violations of the FLSA based on shortened meal periods are not conducive to proof on a class-wide basis.

37

The court finds that the Team Members are not similarly situated with regard to alleged violations of the FLSA with regard to meal periods.

The evidence is undisputed that defendant's written policy is to pay employees for all hours worked, including overtime compensation. Plaintiff's evidence shows, at most, sporadic and isolated incidents of unpaid time within one limited geographic location and in violation of defendant's written policies. She has not demonstrated – through allegations and evidence – a systemic policy, practice, or pattern of unpaid time or a common nexus between her claims and the claims of the members of the proposed collective action such that all claims could be efficiently decided in a single action. Assuming that other employees desire to opt-in, plaintiff has not put forth substantial evidence that she and the proposed collective action members are subject to a uniform policy or practice of cutting hours or not paying for all hours worked. The record lacks even a "rudimentary showing of commonality between the basis for [her] claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions." *Marsh,* 242 F. Supp. 2d at 1093. There are no "common issues of law or fact arising from the same alleged [unlawful] activity" such as can be resolved efficiently in one proceeding. *Hoffman-LaRoche*, 493 U.S. at 170.

Therefore, certification of this collective action is improper. Consequently, plaintiff's Motion for Conditional Certification of Collective Action Pursuant to 29 U.S.C. § 216(b) and

to Issue Notice, (doc. 28), is due to be denied.  The opt-in claimants will be dismissed without prejudice.[10]

## **CONCLUSION**

For the reasons stated above, plaintiff's Motion for Conditional Certification of Collective Action Pursuant to 29 U.S.C. § 216(b) and to Issue Notice, (doc. 28), is due to be denied.   An Order in conformity with this Memorandum Opinion will be entered contemporaneously.

**DONE**, this 24th day of March, 2014.

*Sharon Lovelace Blackburn*

SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE

---

[10]"[T]he statute of limitations has been tolled for these potential opt in plaintiffs as of the dates they filed their consents to opt in." *Chapman v. Fred's Stores*, No. 2:08-cv-01247-HGD, 2013 WL 1767791, *12 n.1 (N.D. Ala. Mar. 15, 2013)(citing *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1380 (11th Cir. 1998)).